IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WANDA JANE EARL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:13-CV-0382-BH |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Consent Case |

## MEMORANDUM OPINION AND ORDER

By order filed November 4, 2013, this matter has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court is *Plaintiff's Brief on Review of the Denial of Benefits by the Commissioner of the Social Security [Administration]*, filed May 3, 2013 (doc. 17.) Based on the relevant filings, evidence, and applicable law, the decision of the Commissioner is **REVERSED,** and the case is **REMANDED** further proceedings.

## I. BACKGROUND[1]

### A.    Procedural History

Wanda Jane Earl (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (R. at 1–3.) On September 14, 2010, Plaintiff applied for SSI, alleging disability beginning on August 18, 2010, due to osteoarthritis, bilateral leg and knee pain, osteomyelitis, periostitis, and osteoarthrosis. (R. at 87–88.) Her application was denied initially and upon reconsideration. (R. at 89–93, 97–100.) She requested a hearing before an Administrative

---

[1]    The background information is summarized from the record of the administrative proceedings, which is designated as "R."

Law Judge (ALJ) and personally appeared and testified at a hearing on November 1, 2011.  (R. at 32–86.)  On January 27, 2012, the ALJ issued her decision finding Plaintiff not disabled.  (R. at 19–28.)  Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request on December 12, 2012, making the ALJ's decision the final decision of the Commissioner.  (R. at 1–3.)  Plaintiff timely appealed the decision under 42 U.S.C. § 405(g).  (doc. 1.)

**B.**     **Factual History**

      **1.**     **Age, Education, and Work Experience**

Plaintiff was born on April 26, 1964; she was 47 years old at the time of the hearing before the ALJ.  (R. at 41–42.)  She attended but did not complete high school, and she took some health courses at a community college.  (R. at 44–45.)  She has past relevant work as a hand packager, industrial cleaner, and painter.  (R. at 80.)

      **2.**     **Medical Evidence[2]**

On November 5, 2010, Plaintiff presented to Texas Health Cleburne (Texas Health), complaining of back pain, fatigue, and recent weight loss.  (R. at 237.)  X-rays of her lumbar spine revealed mild disk space narrowing at L5-S1, but otherwise there was "no acute osseous abnormality."  (*Id.*)  X-ray impressions of her chest were normal.  (R. at 240.)  X-rays of her right knee taken on November 30, 2010, revealed "small osteochondral defect involving the intercondylar eminence of the tibia," but "no fracture or dislocation."  (R. at 219.)  A computed tomography (CT) scan and Magnetic Resonance Imaging (MRI) were recommended for further evaluation.  (*Id.*)

On December 20, 2010, Plaintiff saw Stella Nwanko, M.D., an internal medicine specialist and consultative examiner for disability determination services, for a physical examination.  (R. at

---

[2]  The resolution of Plaintiff's appeal depends on her back impairment, a physical impairment.  Accordingly, only the medical evidence is included in this summary.

215.) She told Dr. Nwanko that she had experienced weakness and pain in her legs for over a year, had difficulty sitting, and could stand for only one or two minutes without holding on to something to prevent her from falling. (*Id*.) She also experienced numbness and tingling in her legs at night. (*Id*.) She rated her leg pain at 7 on a 10-point scale and explained that it felt "like a bruise, like somebody punched her", and that it worsened in damp and cold weather. (*Id*.) She denied any illicit drug use, but admitted smoking three fourths of a pack of cigarettes and drinking nine 12-ounce beers a day. (*Id*.)

Plaintiff told Dr. Nwanko that she worked as a house painter and cleaner until "the business closed" in 2005. (R. at 216.) She was not taking any medications. (*Id*.) She complained of a persistent cough, ringing in her ears, sinus problems, "vision halos," poor appetite, diarrhea, bowel changes, excessive thirst, and frequent urination. (*Id*.) Upon a physical examination, Dr. Nwanko found that Plaintiff had an irregular and rapid heartbeat, was awake, alert, and oriented, and had no apparent distress. (R. at 217.) She could "stand but she ambulated . . . with some limping." (*Id*.) "She did not appear to have difficulty sitting down during [the] exam," but was unable to squat or hop. (*Id*.) She could handle small objects, her hand grip strength was "good bilaterally," and could "reach, handle, finger, and feel." (*Id*.) An examination of her spine "was unremarkable" with no spasm or tenderness. (*Id*.) Dr. Nwanko observed "wasting of her muscle bulk and mass" in her extremities, which she opined was "evidence of recent weight loss." (*Id*.) There was bilateral knee bowing, with the right knee being worse than the left, and crepitus in both knees. (*Id*.) Plaintiff had a full range of motion in all extremities. (R. at 218.) X-rays of her right knee showed a small osteochondral defect and joint space narrowing that could be related to "mild osteoarthritis." (R. at 219.) Dr. Nwanko's diagnosed her with pain and weakness in the legs and knees bilaterally,

muscle wasting, depression, and alcohol abuse. (R. at 218.)

On January 20, 2011, John Durfor, M.D., a state agency medical consultant (SAMC) reviewed Plaintiff's treatment notes and completed a physical residual functional capacity (RFC) assessment. (R. at 221–28.) Dr. Durfor listed Plaintiff's primary diagnosis as "mild osteoarthritis" and her secondary diagnosis as "bilateral leg and knee pain." (R. at 221.) He opined that Plaintiff had the following physical RFC: lift and carry 50 pounds occasionally and 25 pounds frequently; sit, stand, and walk for about 6 hours in an 8-hour workday with normal breaks; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, crawl; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and no manipulative, visual, communicative, or environmental limitations. (R. at 224–28.) In reaching these findings, Dr. Darfor noted Plaintiff's complaints to Dr. Nwanko the month before that she suffered from pain in her legs and hips. (R. at 228.) He also noted Dr. Nwanko's consultative observations that Plaintiff could ambulate without assistive devices, had no difficulty sitting down during the exam, could walk in tandem and heel-to-toe, and had an "unremarkable" examination of her spine. (*Id.*) He concluded that Plaintiff's allegations about her limitations were "not wholly credible" because they were "not supported" by the medical evidence of record. (*Id.*) Dr. Darfur's RFC assessment was later reviewed and affirmed by Kavitha Reddy, M.D., another SAMC. (*See* R. at 312.)

Plaintiff saw Yevgeniy Ostrinsky, M.D. at Texas Health Arlington Memorial Hospital (Arlington Memorial) in January and February 2011 to follow up with her "generalized fatigue and weakness." (R. at 248, 250–55.) On February 8, 2011, Dr. Ostrinsky found that a liver function test "showed iron overload" and a sonogram revealed a lesion on the right lobe of Plaintiff's liver "consistent with hemangioma." (R. at 248.) He indicated that she "continue[d] to drink . . . several

-4-

beers per day" and smoked cigarettes. (*Id.*) His diagnoses were hemochromatosis, nonspecific elevation of levels of transaminase or lactic acid dehydrogenase, and benign neoplasm of liver and biliary passages. (*Id.*) He advised Plaintiff "to stop drinking alcohol," but noted that she had "no interest in quitting." (*Id.*)

An MRI of Plaintiff's lumbar spine taken on February 17, 2011, showed disk dehydration and loss of disk height at L4-L5, diffuse degenerative spondylosis,[3] and central spinal canal stenosis at L4-L5.[4] (R. at 232.) There was also "severe stenosis of the bilateral neuroforamina at L4-L5 and L5-S1 due to loss of disk height, prominent posterior lateral component of circumferential disk bulge, and degenerative facet arthropathy." (*Id.*) Erik John Furman, Plaintiff's primary care physician at Texas Health, referred Plaintiff for a neurological evaluation. (R. at 324.)

Upon Dr. Furman's referral, Plaintiff presented to the Center for Neurological Disorders, P.A. (CND) on March 7, 2011, for an initial consultation. (R. at 259, 323.) She told George F. Cravens, M.D., a neurologist at CND, that she experienced ongoing back and leg discomfort for many years that was becoming "progressively worse." (R. at 320.) Although her pain was primarily in her lower back and was constant, she occasionally experienced pain that radiated down her legs. (*Id.*) She had also experienced "three episodes where her legs ha[d] gone completely numb" and ambulated with a cane due too her "gait instability." (*Id.*) She admitted drinking a 12-pack of beer and smoking one and a half packs of cigarettes every day. (R. at 321.) Upon a neurological

---

[3] Spondylosis is degenerative osteoarthritis of the joints between the center of the spinal vertebrae and neural foramina. If severe, it may cause pressure on nerve roots with sensory and motor disturbances, such as pain, paresthesia, and muscle weakness in the limbs. *See* Spine-Health.comwww.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means (last visited March 25, 2014). The symptoms of spondylosis gradually increase over time. *See Attorneys' Dictionary of Medicine and Word Finder* C-176 (LexisNexis, 2011).

[4] Stenosis is an abnormal narrowing of the spinal canal that creates leg pain while walking. *See* Spine-Health.com, http://www.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means (last visited March 25, 2014).

examination, Dr. Cravens found that she had "generalized weakness in her lower extremities." (R. at 321.)  A CT scan of her lumbar spine taken that day showed mild to moderately severe broad-based disk bulge at L5-S1 with vacuum changes and vacuum disk phenomenon at L4-L5. (R. at 323.)  Dr. Cravens diagnosed her with lumbar radiculopathy,[5] referred her to physical therapy, and ordered additional laboratory testing. (R. at 259, 321.)

The following week, Plaintiff presented to Walls Regional Hospital (Walls) for an initial lumbar spine evaluation and to begin her physical therapy. (R. at 269–72.)  Reinier Botha, her physical therapist, noted that she ambulated with staggering and ataxic gait, had a "minimal limp," and used a cane. (R. at 269.)  Plaintiff tested positive for straight leg raises, as well as for Patrick's and Gapping tests, which in Ms. Botha's opinion, indicated that her sacroiliac joint was a source of her pain. (R. at 270.)  That day, Plaintiff could lift one gallon safely and could walk four blocks "comfortably," thereby meeting the "expectations." (R. at 307.)

Upon her release from therapy on May 9, 2011, Plaintiff still had low back pain that she rated at 2 on a 10-point scale. (R. at 273, 304.)  She could lift 30 pounds from the floor to her waist, had a reduced range of motion, and could walk 4 blocks. (R. at 304.)  Ms. Botha opined that she had met all of the program's goals. (*Id.*)  Similarly, Dr. Cravens opined that she had experienced "significant improvement in her discomfort and weakness" with physical therapy. (R. at 319.)  Plaintiff even reported being "pleased with how she [was] doing" and was "not using a cane at [that] point." (*Id.*)

By August 15, 2011, however, Plaintiff was experiencing "residual recurrence of her low back and bilateral leg pain." (R. at 318.)  She also had a fast heart rate and Peter Leonard, M.D.,

---

[5]  Radiculopathy is a "[d]isorder of the spinal nerve roots." *Stedman's Medical Dictionary* 1622 (28th ed. Lippincott Williams & Wilkins, 2006).  Symptoms include pain, numbness, tingling, and weakness in the arms and legs. *Id.*

another neurologist at CND, "placed" her on a "beta-blocker" to control it.  (*Id.*)  Dr. Leonard also recommended that she undergo epidural steroid injections to treat her low back and leg pain.  (*Id.*)  Two weeks later, Plaintiff was administered epidural steroid injections at L4-L5.  (R. at 317.)  She told Dr. Leonard that her low back pain caused her "some difficulty walking."  (*Id.*)  Dr. Leonard noted that the MRI taken on February 17, 2011, revealed "significant stenosis" at L4–L5 and L5–S1.  (*Id.*)  After Plaintiff underwent additional injections two and four weeks later, she told Dr. Leonard that her relief "only lasted for several days" at a time.  (R. at 315–16.)

Plaintiff saw Dr. Cravens on November 4, 2011, and told him that her low back pain was becoming progressively worse and radiated down her right leg.  (R. at 314.)  She denied having any numbness or tingling, but stated that she felt "generalized weakness" and was "unable to complete most [of her] daily activities" as a result.  (*Id.*)  Dr. Cravens noted that conservative treatment had failed to relieve Plaintiff's symptoms and scheduled a CT scan, a myelogram, and an electromyography (EMG) to further evaluate her condition.  (*Id.*)

A CT scan taken on November 15, 2011, showed degenerative disk bulging at L3-L4, L4-L5, and L5-S1, severe bilateral neural foraminal stenosis at L5-S1, and moderate bilateral foraminal stenosis at L4-L5.  (R. at 329–30.)  These findings were confirmed in a myelogram performed that same day.  (R. at 333.)  An EMG showed abnormal findings that suggested compressive nerve irritation at L5-S1 consistent with radiculopathy.  (R. at 335.)[6]

### 3. **Hearing Testimony**

On November 1, 2011, Plaintiff and a vocational expert (VE) testified at a hearing before the

---

[6] The record also includes medical treatment notes that were not before the ALJ but were submitted for the first time to the Appeals Council.  (*See* R. at 344–70.)  That evidence is not included in this summary because it is not necessary for the resolution of the case.

ALJ.  (R. at 32–86.)  Plaintiff was unrepresented.  (R. at 32–34.)

        *a.*        ***Plaintiff's Testimony***

Plaintiff testified that she was 47 years old, was 5 feet 5 inches tall, and weighed 112 pounds. (R. at 41–42.)  She lived in a duplex with her ex-husband.  (R. at 43.)

Plaintiff drank two 12-ounce beers and smoked about half a pack of cigarettes a day.  (R. at 43–44.)  She last "smoked pot in high school."  (R. at 44.)  She did not graduate from high school and did not have a GED, but she took some "health courses" at a community college as a prerequisite for her "jobs in the food industry."  (R. at 44–45.)  Although she could drive and had a driver's license, she did not own a car.  (R. at 46.)

Plaintiff last worked for a day and a half in April 2011, when she helped her son with contract work.  (R. at 47–48.)  From February 1999 to January 2003, she worked in a food warehouse doing maintenance work.  (R. at 48–49.)  As the "head of sanitation," she operated forklifts, cleaned, and assisted her supervisor with anything he needed.  (R. at 49.)  She also worked "on and off" for Jim Walter Homes, including cleaning, doing interior and exterior painting, caulking, washing paint buckets, and doing other random tasks, until August 2010.  (R. at 49–50.) Her average monthly income in this job was about $1,400.00.  (R. at 53.)

Plaintiff listed August 18, 2010 as her onset date on her application for benefits because that was the date when she could no longer walk around without holding on to something.  (R. at 54.) She always parked next to shopping carts so that she could "get out of the van and get to a shopping" cart right away.  (*Id.*)  She had osteoarthritis in her legs and knees and experienced pain as a result. (R. at 55–56.)  She could not work because she was unable to "stand or go anywhere without help." (R. at 56.)  She walked with a cane because she felt as if her legs "would collapse."  (R. at 56.)  On

average, her pain was about 5 on a 10-point scale.  (R. at 57.)  She took prescription medication and underwent four steroid injections in an attempt to relieve her pain.  (R. at 58–59.)

On a routine day, Plaintiff checked the mail, went to the store "a lot of times", cooked three meals a day, fed her dog and cat, played with her granddaughter, watched television for 3 hours, and read for 2 hours.  (R. at 60.)  She could grab and handle items such as eggs, bread, chips, cereal, etc. and could also lift a gallon of milk.  (R. at 61.)  She could bathe and groom by herself, although with some difficulty.  (*Id.*)  She liked watching the news and could understand and follow what was said.  (R. at 62.)  She had no sleeping problems.  (R. at 63.)

Plaintiff's primary care physician was Dr. Furman, and she saw Dr. Leonard for her steroid injections.  (R. at 66–67.)  The longest she could stand in one place was 30 minutes, but she had to "lean on something" the entire time.  (R. at 72.)  She could sit for only 40 minutes before having to get up, and could climb one flight of stairs as long as she was holding on to the rail.  (R. at 72–73.)  While she could lift and carry a gallon of milk and a bag of potatoes weighing about 8 to 10 pounds, she could not carry a 20-pound bag of dog food.  (R. at 74.)  She could stoop, reach, kneel, squat, pick up small items, concentrate, and follow simple 1 and 2-step instructions.  (R. at 75–76.)

### b.    *VE's Testimony*

The VE classified Plaintiff's past relevant work as a hand packager (medium, unskilled, SVP-2), industrial cleaner (medium, unskilled, SVP-2), and painter (medium, skilled, SVP-7).  (R. at 80.)  The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform her past relevant work if she had the following RFC: perform medium work, occasionally climb ladders, ropes, and scaffolds, and frequently perform all

other postural requirements.  (R. at 81.)  The VE opined that the hypothetical person could perform all three of Plaintiff's past relevant jobs.  (R. at 82.)  The ALJ modified the hypothetical to the following: perform light work, never climb ladders, ropes, or scaffolds, and occasionally perform other postural requirements.  (*Id.*)  The VE opined that the hypothetical person could perform other jobs existing in the national economy, such as light hand packager (light, unskilled, SVP-2), with 75,000 jobs in the national economy and 5,000 in Texas, and conveyer line tender (light, unskilled, SVP-2), with 25,000 jobs in the national economy and 1,200 jobs in Texas.  (*Id.*)

The ALJ modified the hypothetical again to perform sedentary work with the option to sit or stand every 30 to 60 minutes and require the use of an assistive device to ambulate.  (R. at 83.)  The VE opined that the person could perform the jobs of sorter (sedentary, SVP-2), with 25,000 jobs in the national economy and 2,500 jobs in Texas and hand laborer (sedentary, SVP-2), with 49,000 jobs in the national economy and 4,300 jobs in Texas.  (*Id.*)  The VE explained that in these last two positions, the person may need to walk about 300 feet to get to her designated work area and also walk around "right within the work area."  (R. at 83–84.)  According to the VE, the individual's need to use an assistive device to ambulate "would not impair [her] ability to perform the job."  (*Id.*)  Lastly, in response to a question by the ALJ, the VE testified that the person would not be able to maintain competitive employment if she could not "maintain work activity" for 8 hours a day, 5 days a week on a continuing and sustained basis "due to the inability to stand and walk effectively."  (*Id.*)

## C.    **ALJ's Findings**

The ALJ issued her decision denying benefits on January 27, 2010.  (R. at 19–28.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 14, 2010, the date of her application.  (R. at 21.)  At step two, the ALJ found that Plaintiff had two

-10-

severe impairments: bilateral leg and knee pain and osteoarthritis. (*Id.*)  Despite those impairments, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

Before proceeding to step four, the ALJ found that Plaintiff had the following RFC: perform sedentary work i.e., lift and carry 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand and walk for 2 hours in an 8-hour workday; never climb, kneel, crouch, or crawl; occasionally push and pull; have the opportunity to alternate between sitting and standing approximately every 30 to 60 minutes; and use an ambulatory device while performing job duties.  (R. at 25.)  At step four, with the VE's testimony, the ALJ determined that Plaintiff could not perform her past relevant work.  (R. at 27.)  At step five, also based on the VE's testimony, the ALJ determined that considering Plaintiff's age, education, work experience, and RFC, she could perform the jobs of "sorter" and "hand laborer" which existed in significant numbers in the national economy.  (R. at 27–28.)  Accordingly, the ALJ concluded that Plaintiff was not disabled, as the term is defined under the Social Security Act, from the date of her application to the date of the ALJ's decision. (R. at 28.)

## II. ANALYSIS

### A.    <u>Legal Standards</u>

#### 1.    **Standard of Review**

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(c)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.*  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mentla impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*,

954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.      If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greendspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813

F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff presents two issues for review:

(1)  Whether new evidence submitted to the Appeals Council was so inconsistent with the ALJ's findings that it undermined the ultimate disability determination when the new evidence consisted of treatment records and opinions from the Earl's treating physician which directly contradicted the ALJ's findings; [and]

(2)  Whether the Commissioner's step two and residual functional capacity (RFC) findings were supported by substantial evidence when they failed to consider [Plaintiff's] back impairment.

(Pl. Br. at 1.)

**C.      Step Two Severe Impairment Determination[7]**

Plaintiff asserts that the ALJ "failed to include [Plaintiff's] severe back impairment" in her step two finding, and that this was error because the objective medical evidence showed that her back impairment was a severe impairment.  (Pl. Br. at 12–15.)

*1.      ALJ's Step Two Findings*

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments."  20 C.F.R. § 404.1520(a)(4)(ii),(c) (2012).  To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'"  *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010).  Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to

---

[7]  Although Plaintiff lists and briefs this issue second, it is addressed first because it involves an earlier stage of the disability determination process.

interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104–05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only . . . make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n. 5 (5th Cir. 1992) (citation omitted). "Because a determination [of] whether an impairment[] is severe requires an assessment of the functionally limiting effects of an impairment[], [all] symptom-related limitations and restrictions must be considered at this step." Social Security Ruling (SSR) 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). Ultimately, a severity determination may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104.

Here, at step two, the ALJ stated that she was "aware of the *de minimis* severity standard of *Stone v. Heckler.* . . ." (R. at 25.) Based on the "objective medical evidence of record," she found that Plaintiff's bilateral leg and knee pain and osteoarthritis were severe impairments since they "would have more than a slight effect on her ability to work." (R. at  21.) The ALJ's step two discussion did not address or even mention Plaintiff's back impairment, including her degenerative

joint disease, degenerative spondylosis and facet arthropathy, central spinal canal stenosis at L4-L5, neuroforaminal canal stenosis at L4-L5 and L5-S1, and lumbar radiculopathy. (*See id.*) Her back impairment could reasonably be said to constitute a "medically determinable impairment" because it was "demonstrable by medically acceptable clinical and laboratory techniques," such as the MRI and X-rays taken on February 17, 2011; the CT scan, EMG, and myeologram taken on November 15, 2011; and Dr. Craven's March 7, 2011 diagnosis of radiculopathy. (*See* R. at 232, 259, 329–30); *see also* 42 U.S.C.A. § 423(d)(3) (West 2004) ("[A] 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which

-15-

are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ's failure to determine the severity of Plaintiff's back impairment at step two as required by 20 C.F.R. § 404.1520(a)(4)(ii),(c) was legal error. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 838 (N.D. Tex. 2008) (explaining that violation of a regulation constitutes legal error).

Nevertheless, courts in this Circuit have held that where the ALJ fails to specifically determine the severity of a claimant's impairments at step two, remand is not required where the ALJ proceeds to the remaining steps of the disability analysis and considers the alleged impairment's —or its symptoms—effects on the claimant's ability to work at those steps. *See, e.g.*, *Herrera*, 406 F. App'x at 3 and n.2 ; *Abra v. Colvin*, No. 3:12-CV-1632-BN, 2013 WL 5178151, at *4 (N.D. Tex. Sept. 16, 2013) (listing cases). This approach is consistent with recent cases holding that an ALJ's failure to apply the correct standard at step two in determining the severity of the claimant's impairments (i.e., *Stone* error) "does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate [] where the ALJ proceeds past step two in the sequential evaluation process." *Gibbons v. Colvin*, No. 3:12-CV-0427-BH, 2013 WL 1293902, at *14 (N.D. Tex. Mar. 30, 2013) (citing cases); *see also Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis where the ALJ failed to cite *Stone* in finding at step two that the claimant's alleged mental impairment was non-severe). Accordingly, to obtain remand, Plaintiff must show that the ALJ's step two error was not harmless. *See Garcia v. Astrue*, No. CIV. M-08-264, 2012 WL 13716, at *12 (S.D. Tex. Jan. 3, 2012) ("Assuming . . . that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error.");

### 2.      *Harmless Error*

In the Fifth Circuit, harmless error exists when it is "inconceivable" that a different administrative determination would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Plaintiff argues that the ALJ's step two error was not harmless because it "led to an RFC that did not include all of [her] limitations," and the "improper RFC" in turn "could have led to an improper disability determination."  (Pl. Br. at 12–16.)

At step three, in her summary of the medical evidence, the ALJ referenced Plaintiff's allegations of back pain, the February 2011 X-rays showing "mild central stenosis . . . and neural foraminal canal stenosis bilaterally at L4–L5," and Dr. Cravens's diagnosis of "lumbar radiculopathy" in March 2011.  (*See* R. at 23, 232, 259.)  Finding that "no treating source ha[d] documented a medically determinable impairment that would prevent [Plaintiff] from engaging in substantial gainful activity," she concluded that Plaintiff's impairments did not meet or medically equal a listed impairment.  (R. at 25.)

The ALJ next assessed Plaintiff's RFC.  (*See* R. at 25); *see also Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) ("If the [claimant's] impairment is severe, but does not reach the level of a listed disorder, then the ALJ must conduct a [RFC] assessment.") (citing 20 C.F.R. § 404.1520a(d)(3)). The ALJ determined that Plaintiff had the following RFC: perform sedentary work i.e., lift and carry 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand and walk for 2 hours in an 8-hour workday; never climb, kneel, crouch, or crawl; occasionally push and pull; have the option to alternate between sitting and standing every 30 to 60 minutes; and require the use of an ambulatory device while performing the job duties.  (R. at 25.)

In assessing Plaintiff's RFC, the ALJ was required to consider all "medically determinable impairments," including those that were "not 'severe,'" as well as "all of the relevant medical and other evidence" in the record.  *See* 20 C.F.R. § 404.1545(a)(2)-(3) (2012); SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. 1996) ("While a 'not severe' impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.").[8]  In her RFC narrative discussion, the ALJ explained that she "considered all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence."  (R. at 25.)  She "construed" Plaintiff's "testimony as indicating that she [was] incapable of performing any type of work activity," but found that her "medical non-compliance" "impugned her credibility as it relate[d] to her subjective complaints." (R. at 26.)  She pointed, for example, to Dr. Ostrinsky's advice in February 2011 that she stop drinking alcohol given the hemangioma on her liver, and Plaintiff's apparent response that she "had no interest in quitting."  (R. at 26, 248–50.)

The ALJ also referenced Dr. Nwanko's consultative findings on December 20, 2010, that Plaintiff had "no upper extremity limitations."  (R. at 26, 217.)  She found important that Plaintiff had "achieved good results" when she was released from physical therapy in May 2011.  (R. at 26, 273, 304.)  The ALJ acknowledged Plaintiff's complaints to Dr. Leonard in August 2011 that her pain had "return[ed]" and her report to Dr. Cravens in November 2011 that her "severe symptoms precluded" her from "performing [her] activities of daily living."  (R. at 26, 318, 314.)  Based on Plaintiff's testimony regarding her daily living activities, she determined that these were "not as

---

[8] Even if the ALJ had implicitly found at step two that Plaintiff's back impairment was not severe by excluding it from her step two discussion, she was still required to consider this impairment in assessing Plaintiff's RFC.

limited" as she told Dr. Leonard.  (R. at 26, 314.)  She therefore concluded that the evidence did "not support the conclusion" that Plaintiff was "incapable of performing work activity at the sedentary level of exertion."[8]  (R. at 27.)  Because Plaintiff could not perform any of her past relevant work, the ALJ proceeded to step five and considered her RFC and other vocational factors, concluding that Plaintiff could perform the jobs of sorter and hand laborer.  (R. at 27–28.)

The ALJ's RFC discussion did not address or even mention Plaintiff's alleged back impairment.  (*See* R. at 25–27.)  The evidence before the ALJ showed that an MRI of Plaintiff's lumbar spine taken in February 2011 revealed disk dehydration and loss of disc height at L4-L5, mild diffuse degenerative spondylosis and facet arthropathy, central spinal canal stenosis at L4-L5 and neurofaoraminal canal stenosis at L4-L5 and L5-S1.  (*See* R. at 232.)  Plaintiff testified at the hearing that she walked with a cane because she felt as if her legs would "collapse," and she told Dr. Cravens a few days later that she felt "generalized" weakness in her legs.  (R. at 56, 314.)  As noted, the symptoms of spondylosis include pain, paresthesia, and muscle weakness in the legs that increase gradually over time.  *See* Attorney's Dictionary of Medicine at C-176.

In addition, X-rays from February 2011 showed disk space narrowing and degenerative changes at L5-S1.  (R. at 237.)  CT scans taken the following month revealed mild to moderately severe broad-based disk bulge at L5-S1 with vacuum changes and vacuum disk phenomenon at L5-L5.  (R. at 323.)  That day, Dr. Cravens diagnosed Plaintiff with lumbar radiculopathy, a "[d]isorder of the spinal nerve roots" that causes pain, numbness, tingling, and weakness in the arms and legs.

---

[8]  Notably, in determining Plaintiff's RFC, the ALJ did not reference any medical opinion regarding the effects of Plaintiff's impairments on her ability to engage in work-related activities.  (*See* R. at 25–27.)  The Fifth Circuit has "held that an ALJ may not—without opinions from medical experts—derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions," and "an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Williams v. Astrue*, 355 Fed. App'x 828, 832 n. 6 (5th Cir. 2009) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995)).  The ALJ therefore "impermissibly relied on [her] own medical opinions" to implicitly find that Plaintiff's back impairment had no effects on her ability to work. *See Williams*, 355 Fed. App'x at 832.

*See Stedman's Medical Dictionary* at 1622 ; (*see also* R. at 259).  During her initial therapy session, Ms. Botha, Plaintiff's physical therapist, noted that she walked with a staggering and ataxic gait, had a limp, and used a cane.  (R. at 269.)  Plaintiff's straight leg raise tests were positive bilaterally, and she also had positive Patrick's and Gapping tests, indicating that her sacroiliac joint was a source of pain. (R. at 270.)

Although Plaintiff reported having "significant improvement in her discomfort and weakness" with physical therapy in May 2011, by November 2011, she again complained of progressively worsening pain in her lower back that radiated down her right leg and general muscle weakness.  (R. at 304, 314, 319.)  Dr. Cravens found that the conservative treatment, including the epidural steroid injections and physical therapy, "failed" to relieve Plaintiff's symptoms and recommended additional evaluations. (R. at 314–17.)  On November 15, 2011, a CT scan showed degenerative disk bulging at L3-L4, L4-L5, and L5-S1, as well as severe bilateral neural foraminal stenosis at L5-S1 and moderate bilateral foraminal stenosis at L4-L5.  (R. at 329–30.)  An EMG conducted that same day showed abnormal findings that suggested a compressive nerve root irritation at the L5-S1 level consistent with radiculopathy. (R. at 335.)

Because the ALJ did not reference this evidence in assessing Plaintiff's RFC, it is unclear whether she accounted for the effects of her back impairment on her ability to perform work-related functions as required by the regulations.  *See* 20 C.F.R. § 404.1545(a)(1)-(3).  Consequently, it is unclear whether she considered the effects that this impairment may have her ability to work at step five.  Although she included the option to stand or sit as needed every 30 to 60 minutes and the use of a cane while performing the job duties, it is not inconceivable that the ALJ would have imposed

greater restrictions in her RFC if she had considered the effects of her back impairment.[9] If the ALJ
had posed a hypothetical with a stricter RFC to the VE, the VE's testimony regarding Plaintiff's
ability to perform the jobs of "sorter" and "hand laborer" might have been different.

In sum, because it is not inconceivable that the ALJ would have reached a different
determination at step five absent her step two error, the error was not harmless. *See Corbitt v.
Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-558-CWR-LRA, 2013 WL 603896, at *5–6 (S.D. Miss.
Feb. 19, 2013) (remanding where the "ALJ's decision show[ed] that he did not seriously consider
the specific problems" that the claimant's "diabetes create[d]" either at step two or "in the remainder
of the five-step evaluation process to justify a finding of harmless error"); *compare to Adams v.
Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (finding "no ground" for remand where "the ALJ
acknowledged" the claimant's alleged "significant impairment" at step two but found it to be non-
severe, and "went on to find, pursuant to the fourth step of the sequential evaluation analysis, that
[the] impairment did not disable [her] from performing her past sedentary work"); *Boothe v. Colvin*,
No. 3:12-CV-5127-D, 2013 WL 3809689, at * 5–6 (N.D. Tex. July 23, 2013) , at *5 (finding that
any step two error was "harmless because the ALJ considered [the alleged] conditions in his RFC
analysis").

The Court does not reach Plaintiff's remaining issue because the ALJ will necessarily
consider the new evidence that was submitted to the Appeals Council on remand.

### III.  CONCLUSION

The decision of the Commissioner is **REVERSED,** and the case is **REMANDED** to the
Commissioner for further proceedings.

---

[9] For example, on April 13, 2012, Dr. Cravens completed an RFC assessment in which he opined that Plaintiff
could sit, stand, and walk for only 2 hours in an 8-hour workday and would need to lie down or recline for 4 hours to
relieve her pain, weakness in her legs, and balance problems. (R. at 345.)

**SO ORDERED** on this 28th day of March, 2014.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE